29 C.C.P.A.(Patents)
### In re EDWARDS.
**Patent Appeal No. 4525.**

Court of Customs and Patent Appeals.

Dec. 29, 1941.

Thomas E. Scofield and Henry L. Shenier, both of Kansas City, Mo., for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims (Nos. 2, 3, 4, 6 to 12, inclusive, and 14 to 20, inclusive) in appellant's application for a patent for an alleged invention relating to improvements in weighted cements for use in cementing oil or gas wells and a method of cementing such wells with such cements.

At the time of the oral arguments in this court, counsel for appellant moved to dismiss the appeal as to all of the method claims, Nos. 16 to 20, inclusive. The motion will be granted.

Claims 2, 4, 6, 8, 9, and 10, of which claims 2, 9, and 10 are illustrative, call for a pumpable cement slurry for cementing oil wells having incorporated therein a weighting agent, as called for in claims 9 and 10, such weighting agent being specified in claims 2 and 4 as a finely divided metal and in claims 6 and 8 as a finely divided metallic compound. Claims 4 and 9 also contain the statement that the slurry has a "density in excess of that of a usable slurry made with cement and water alone," and claim 10 contains the limitation that the slurry has a density of from 18 to 30 pounds per gallon.

Claims 2, 9, and 10 read:

"2. A pumpable cement slurry for cementing oil wells having incorporated therein a finely divided, suspended metal."

"9. A pumpable cement slurry for cementing oil wells having incorporated therein a weighting agent, said slurry having a density in excess of that of a usable slurry made with cement and water alone.

"10. A pumpable cement slurry for cementing oil wells having incorporated therein a weighting agent, said slurry having a density of from 18 to 30 pounds per gallon."

Claims 3 and 7 are similar to quoted claim 2, except that they call also for a wetting agent.

Claim 11 calls for a pumpable cement slurry for cementing oil wells, such slurry having a wetting agent and a "material" to increase its density.

Claim 12 calls for "A pumpable cement slurry for cementing oil wells having incorporated therein a wetting agent."

Claim 14 calls for a pumpable cement slurry having "incorporated therein *soluble compounds* in sufficient concentration to materially increase the density of the slurry." (Italics ours.)

Claim 15 calls for a pumpable cement slurry and specifies, as a weighting agent to increase the density of such cement slurry, materials, such as "powdered iron or powdered barytes and a soluble compound such as sodium chloride." That claim also contains the statement that the slurry has a "density in excess of that of a usable slurry made with cement and water alone."

The references are:

See, 78,544, June 2, 1868;
Hall, 213,107, Oct. 25, 1876;
Flesheim, 1,012,832, Dec. 26, 1911;
Kleinlogel, 1,470,378, Oct. 9, 1923;
Takata, 1,492,866, May 6, 1924;
Lindstrom, 1,633,790, June 28, 1927;
Steinour, 1,852,595, Apr. 5, 1932;
Krauss, 2,019,980, Nov. 5, 1935.

Appellant states in his application that it is old in the art to use cement slurry to seal off porous formations in gas and oil wells to prevent undesirable fluids flowing into them; that, in order for such cement slurry to set properly and become hardened, it must be uncontaminated, that is, not mixed with mud fluid which, as is well known in the art, serves in the drilling of oil and gas wells to lubricate the drill bit, to carry the drill cuttings out of the well, and as a "hydrostatic head" to prevent the well "from flowing or blowing out"; that ordinarily the *cement slurry* used in gas and oil wells has a density of from 14 to 16 pounds per gallon, and the *mud fluid* used in such wells has a density of about 9.5 to 12 pounds per gallon; that the difference in density between the cement slurry and the mud fluid is apparently sufficient to prevent their intermixing; that in certain territories, however, where "heaving shale" is present "and in deep wells [where high pressures are encountered], the cement does not seem to set properly and re-cementing is required"; that "this is not only costly but dangerous since cementing" in such wells "is frequently a dangerous operation during which the well may be lost"; that in such wells "heavier mud fluids [having a density of approximately 16.5 pounds per gallon] are used, thus reducing the difference in density between the mud and the cement slurry"; that if the cement slurry in a well is agitated or disturbed during its initial set, its strength will be materially decreased; that apparently one of the causes of the difficulties confronting the art was the intermixing of the cement slurry and the mud fluid due to "the small differences in density," and that such intermixing could be prevented by increasing the density of the cement slurry so that it would be at least 5 pounds greater than that of the mud fluid; that with such difference in density, the slurry displaces the mud fluid (the latter floating on top of the slurry) at whatever level in the well it is desired to use the cement; and that the increased density of the cement slurry increases the "hydrostatic head" (or pressure) of the combined mud fluid and cement slurry, thereby preventing agitation or disturbance of the cement slurry during its initial set and affording a

good cement job. It is further stated in appellant's application that, in order to accomplish his purpose, appellant discovered that he could increase the density of the cement slurry by the addition of "finely divided powdered metals, * * * other finely divided, inert and insoluble materials of high density, and * * * soluble substances," and that such materials might be added to his cement slurry either singly or in combination. Some of the materials used to increase the density of appellant's cement slurry, and which are susceptible of fine subdivision so that they may be suspended in the slurry, are iron filings, barytes, various lead oxides, zinc oxide, lead concentrate, galena, zinc sulphide, copper sulphide, and other heavy substances. Appellant further states that under certain conditions, oxides of lead are not wetted by water and, therefore, do not increase the density of the cement slurry, and that, under such circumstances, a wetting agent, such as naphthenic acid, sulfonated oil, metallic soap, or the like may be used so that the finely divided lead oxide will be suspended in the cement slurry.

The patent to See relates to an "Improved Composition for Covering Roofs, Pavements, and Walks, for Lining Cisterns, Damp Cellars, and Docks, for Plastering Outside Walls, for Making Bricks and Tiles, and for other similar uses," and discloses a composition of hydraulic cement, iron ore, turnings, borings, or filings, sand, and salt. The patentee states that his composition should be thoroughly pulverized and water added thereto until the composition "forms a mortar, of the proper consistency to apply with a trowel or otherwise, as desired."

The patent to Hall relates to improvements in the manufacture of artificial stone for paving, building, or other purposes. The patentee states that he mixes Portland cement with other materials including sand, "iron or steel turnings, borings, or filings, either wrought or cast, or with oxide of iron, provided it be tolerably free from earthy matter"; that the iron, steel, or oxide of iron is disintegrated into small particles; that the mixture is slightly but thoroughly wetted, and is then placed in a mold and subjected to great pressure "by hydraulic or other means."

The patent to Flesheim relates to a method of bonding concrete, and discloses the idea of coating an old concrete surface, to which a new concrete structure or mass is to be bonded, with a layer of mortar composed of cement, finely divided iron particles, and an agent for expediting the oxidation of the iron particles. The bonding method is successfully performed by applying the new concrete structure or mass before the mortar has set. The patentee states that, due to oxidation, the iron particles will expand and will "compensate in a large measure [for] the shrinkage of the cement due to its drying and hardening, and so diminish its tendency to curl up and peel away from the surface to which it is applied."

The patent to Kleinlogel relates to a method of manufacturing building materials "from a mixture of Portland cement and metallic or other hard-grained substances," and particularly mentions the importance of a "definite proportion of the weights of the materials used in the mixture with relation to the size of the metallic parts admixed." The patentee states that his building materials possess a greater degree of hardness, are more durable, and are more impervious to water than other cementitious materials.

The patent to Takata relates to an acid proof cement lining for "Digesters of Sulphite Pulp," and discloses a process which, the patentee states, consists in "mixing white clay, lime or calcium carbonate, infusorial earth, asbestos and boric acid or borax thoroughly and the mixture is heated in a furnace, powdered and admixed with lead oxide and the product thus obtained is applied as lining in the state of mud by kneading with sodium silicate solution."

The patent to Lindstrom relates to a cement composition for the surfacing of concrete floors, stairs, pavements, concrete tanks, and other structures, the surfaces of which are apt to deteriorate. The patentee discloses a composition in which cement is mixed with "an abrasive such as carborundum or iron-free corundum," sand or other aggregate and water. The patentee refers to his composition as a "concrete surfacing" for floors and other surfaces which it is desired to make water-proof.

The patent to Steinour relates to a Portland cement composition and a method of making the same, and discloses a composition comprising Portland cement, borate of lime, and oxy-chloride of lime. The patentee states that his composition may be in the form of a slurry, and that it is particularly adapted to the "cementing off" of oil.

wells where temperatures are as high as 200° F.

The patent to Krauss relates to a glazing composition and a method of making the same, and discloses a composition comprising a metallic soap with a dispersing agent containing an ammonium salt of an organic acid, pulverized cement materials, "coloring materials" such as "pigments, crystalline, amorphous, and wholly or partly colloidal silica and siliceous compounds, and inorganic substances practically insoluble in water, and not directly reacting with the cement components of the glaze." The patentee states that his dispersing agent facilitates the surface wetting of the "particles" in his composition. The patentee's glazing composition is used as a coating for building materials such as bricks, tile, terra cotta, building blocks, and cement articles,· and provides such articles with a glossy surface having the characteristics of hardness, durability, and resistance to moisture. The glazing composition apparently may be in the form of a mortar, or, as stated in claim 4 of the patent, by adding an excess of ammonia, it may be in the form of a slurry.

The Primary Examiner rejected all of the composition claims now before us for consideration on the patent to See. He also rejected them as being "fully met by Kleinlogel and Flesheim each of whom combine cement and metallic particles (iron). Flesheim further uses a salt, salammoniac." Claims 6, 7, and 8 were further rejected by the examiner as being fully met by the patents to Hall, Takata, or Lindstrom, "who teach combining cement and finely divided metallic compound." Claims 11, 12, and 14 were further rejected on the patent to Krauss which discloses, according to the examiner, "soluble materials * * * mixed with cement, the dispersing agent present facilitating the wetting action."

The patent to Steinour, according to the Primary Examiner's statement to the Board of Appeals, was cited against the method claims which are not before us for consideration. In view of the arguments presented here by counsel for the parties, however, we deem it advisable to quote that portion of the examiner's statement wherein he referred to the Steinour patent:

"Claims 16 to 20, drawn to the one-step method are rejected as being unpatentable over the *other references cited against the composition claims* in view of Steinour who discloses the use of a cement composition for an oil well cement. ·

\* \* \* \* \* \*

"Steinour further shows that the oil well cement mixtures and other cement mixtures are from the same art and no question of· analogy should arise. (Italics supplied.)"

The examiner further rejected appealed claim 10 on the ground that it was not supported by appellant's disclosure in that it calls for a cement slurry having "a density of from 18 to 30 pounds per gallon." That ground of rejection, however, was· not concurred in by the Board of Appeals, the board stating that as that claim was an original claim it could not be held to cover new matter, although the specific limitation for a cement slurry having a density of from 18 to 30 pounds per gallon was not set forth in appellant's specification.

In its decision affirming the decision of the Primary Examiner, the Board of Appeals said, inter alia:

"\* \* \* It is stated in the specification that in deep wells where high pressures are encountered or in drilling through heaving shale it is necessary to use heavier mud fluids. This reduces the difference in density between the mud and the ordinary cement slurry. Appellant provides a cement slurry under such circumstances of such high density that a sufficiently great difference in density between the cement slurry and the mud fluid in the well is present to enable the cement to be placed in the desired location uncontaminated by the mud fluid. For this purpose he has added to the slurry finely divided or powdered metals and among others suggests iron oxides, barytes and various lead oxides. Under certain circumstances the lead oxides are not wetted by water and a wetting agent is employed.

"*It seems to us that the statement of the problem suggests the solution, at least to increase the specific gravity of the cement slurry. While it is true that the prior art does not describe such a weighted slurry,· yet it shows that various metallic substances, some of them finely divided, have been· used in hydraulic cements for many purposes and in view of such a teaching it would not seem to be invention to weight the pumpable cement slurry in cementing oil wells as described by appellant.* Clearly· those claims which refer to the cement slurry itself are unpatentable as they distinguish primarily from the references by recitation of a slurry ·as against a cement

mortar. Also the use of a wetting agent if necessary, is lacking in invention.

"We believe, therefore, that the prior art is pertinent, at least for the purpose above indicated. *It may be that none of these references describes a cement slurry which could be used for cementing oil wells but we are not inclined to find patentability in claims which so distinguish over the prior art.* (Italics not quoted.)"

Relative to appealed claim 4, the board stated that it was sufficiently broad to call for a cement slurry having a greater density "than that of the usual slurry made with cement and water which is clearly unpatentable, involving a matter of degree of density."

As hereinbefore noted, claim 4 calls for a pumpable cement slurry for "cementing off" oil wells having incorporated therein a finely divided metal, and also contains the statement that the slurry has a density in excess of a usable slurry made with cement and water alone. Accordingly, the statement by the board that it calls merely for a pumpable cement slurry having a greater density than that of the usable cement slurries made with cement and water alone is unwarranted.

It is apparent from what has been said that the prior art cited discloses, among other things, mortars or plastic masses, composed of cement, water, and finely divided metals, including iron filings, turnings, borings, and oxide of iron, for use in lining cisterns, etc., plastering outside walls, and bonding new concrete structures to old ones, and for the making of brick, tile, and other building materials.

Only two of the references cited, Steinour and Krauss, disclose a cementitious material in the form of a slurry. The patent to Krauss, as hereinbefore noted, relates to a glazing composition for glazing building materials. The composition may vary in consistency, according to the conditions under which it is to be applied. The inorganic and insoluble substances used in the patentee's composition are apparently used as coloring matter. The patent to Steinour discloses a cementitious composition in the form of a slurry, which, the patentee states, is particularly adapted to the "cementing off" of oil wells. However, the patentee's composition is composed of Portland cement, borate of lime, oxy-chloride of lime, and water. It does not contain inorganic substances for the purpose of increasing its density. The Steinour

reference merely discloses what the applicant stated in his application was the prior art slurry used for the "cementing off" of oil and gas wells. It is evident, therefore, as held by the Board of Appeals, that none of the references discloses appellant's composition.

As hereinbefore noted, the board stated in its decision that "It seems to us that the statement of *the problem* suggests the solution, *at least to increase the specific gravity of the cement slurry.*" (Italics not quoted.) As we understand that statement, the board was of opinion that the problem confronting the art was to determine the cause for the failure of the prior art cement slurry to set properly and to "cement off" oil and gas wells where, as in deep wells, high pressures are encountered and "heaving shale" is present, and in which mud fluids heavier than those used in ordinary wells are employed, and that the "statement of the problem suggests the solution"; that is, "to increase the specific gravity of the cement slurry."

Stated differently, the board was of opinion that, although appellant discovered that the reason the prior art cement slurries would not properly "cement off" such wells was because the differences in density between the heavier mud fluids and such cement slurries were insufficient and that the "specific gravity" of such cement slurries should be increased, such discovery would be obvious to one skilled in the art, and, therefore, would not involve invention.

The board's expression of opinion is challenged by appellant's reasons of appeal in this court, and, although it is repeatedly stated, in substance, in the brief of counsel for appellant that appellant discovered the reason for the failures in the prior art cementing operations, such statements are not questioned here by the Solicitor for the Patent Office.

The board also held that, in view of the references of record, it would be obvious to one skilled in the art that sufficient differences in density between the heavier mud fluids and the prior art cement slurries could be obtained by adding to the latter finely divided metallic substances, such as those referred to in appellant's application.

It appears, therefore, that the board divided appellant's concept into two parts; to wit, his conception that it was necessary, for the reasons hereinbefore stated, to increase the density of the prior art cement slurries so that a greater ratio of differ-

ences in density would exist between them and the heavier mud fluids, which the board held did not involve invention; and his conception of increasing the density of pumpable cement slurries by including therein finely divided or powdered metals together with a "wetting agent" where certain ·weighting materials, such as oxide of lead, are employed, which the board also held did not involve invention.

■ Upon what evidence the board relied for its holding that the first part of appellant's concept was obvious to one skilled in the art and, therefore, did not involve invention does not appear either from the board's decision or from anything else of record, as there is nothing in any of the references cited which could be considered as even remotely suggesting such concept. When appellant provided his cement slurries with finely divided or powdered metals as weighting agents and thereby increased the density of such slurries so that the proper differences in density existed between them and the heavier mud fluids his invention was complete, and, as there is nothing of record to warrant a holding that the first part of his concept was not inventive, it becomes immaterial, for the purpose of this decision, whether the second part of his inventive concept, that is, providing his pumpable cement slurries with finely divided or powdered metals as weighting agents for the purpose of increasing their density, was or was not obvious in view of the prior art cited. See In re Earle et al., 102 F.2d 232, 26 C.C.P.A. (Patents) 974.

■ That appellant's pumpable cement slurries are novel, useful, and of practical importance to the art, is not questioned. We are of opinion, therefore, that, on the record presented, such of the appealed claims as properly define appellant's pumpable cement slurries are patentable and should be allowed. Appealed claim 12, however, as hereinbefore noted, calls for "A pumpable cement slurry for cementing oil wells having incorporated therein a wetting agent." It does not call for a weighting agent of any kind, and, therefore, does not, in our opinion, define appellant's invention.

The appeal is dismissed as to claims 16 to 20, inclusive, and the decision of the Board of Appeals is modified, being affirmed as to claim 12, and reversed as to claims 2, 3, 4, 6 to 11, inclusive, 14, and 15.

Modified.

BLAND and LENROOT, Associate Judges, dissent as to claims 2, 3, 4, 6 to 11, inclusive, 14 and 15.